**INDEPENDENT IRON WORKS, Inc. v. E. E. BLACK, LIMITED.**

**Civ. No. 909.**

United States District Court
D. Honolulu, Hawaii. First Division.
Sept. 14, 1950.

Levinson & Cobb, Honolulu, T. H., for plaintiff.

Robertson, Castle & Anthony, Honolulu, T. H., J. Garner Anthony, Honolulu, T. H., of counsel, for defendant.

METZGER, Chief Judge.

The plaintiff, a California corporation, brought its action on April 11, 1949, against defendant, an Hawaiian corporation, and alleged, inter alia, that on July 9, 1948, defendant was indebted to it, by reason of an agreement of March 25, 1948, in the sum of $104,475.62, against which defendant thereafter, on October 8, 1948, paid $19,253.45, and on March 18, 1949 paid $52,799.95, leaving an unpaid balance at the time action was brought of $32,502.-24, and an additional charge of $80 for blueprints, with interest of 7% per annum on $85,222.19 from July 9, 1948, until March 18, 1949, and on $32,422.24 from March 18, 1949, until paid, together with costs and reasonable attorneys' fees. A copy of the contract between the parties, as of March 25, 1948, is attached to the Complaint as Exhibit "A".

The defendant answered on April 29, 1949, with denial and counterclaims: Denied that plaintiff performed its agreement with defendant, but that defendant was forced to rectify deficiencies, counterclaiming as follows: (a) $1,310.50 for steel which it alleges was short in delivery; (b) $447.80, the cost of corrections for installing galbestos, caused by alleged faulty

fabrication; (c) $7,645.25 which defendant paid the Territory as 2½% gross income tax on imported and used fabricated steel supplied by plaintiff, and (d) $9,795.-95 which it alleges is a balance due it under its contract with Industrial Development Company for erecting the steel for fulfillment of which plaintiff is bond security for faithful and complete erection by Industrial Development Company of wharf sheds and for any labor and material furnished for that purpose by third parties.

Defendant denies liability for all the $32,422.24 claimed by plaintiff and the additional sum of $80 later added, and asserts as follows: That plaintiff claims a delivery and billed it for 28.2395 tons more steel at $200 per ton than the weights calculated by Harbor Board engineers; that a further 22.748 tons were expressly excluded from payment by the contract between defendant and Harbor Board; that plaintiff claims 1.5675 more steel at $197 per ton than the Harbor Board computed and allowed, besides 1.0515 tons of this steel was expressly excluded by the Territory contract; that these discrepancies and exclusions amount to $10,712.24. Further, defendant denies liability for a charge of $1,444.55 for revisions of and additional shop drawings and additional items of $383.90 and $37.58 for the same, also $744.-48 for additional shop welding, and $80 for 160 additional blueprints demanded of plaintiff by the Harbor Board.

The action was at issue May 17, 1949 and came on for two days hearing in February 1950, dealing at that time with the practice of ascertaining weights in the purchase of steel; practice on the Pacific Coast and in the United States with reference to charging for wastage in shop fabrication, mill over-runs, under-runs and theoretical weights, etc., and the weight and durability of "shop paint", and the use of American Institute of Steel Construction Code (AISC) as a guide and authority in those matters, and finally, the fact that the Territory paid the contractor (defendant) on the basis of its Harbor Board engineers' computation of weights as provided in its contract specifications, which differed materially from the plaintiff's weights as billed by it to the defendant. Further trial was thereafter continued from time to time until August 14, 1950, continuing for seven days through August 22, 1950.

The only exhibits put in evidence in the February hearing were (1) the defendant's contract with the Territorial Harbor Board for Job H.C. 750 for wharf shed construction at Hilo, (2) four sheets showing weights of structural steel, bolts, nuts, welds, washers, etc., and field welds, as the basis of plaintiff's billing to defendant, and (3) plaintiff's business card upon which E. E. Black had written "230.00 ton erected", as being an oral offer given him by W. G. Meagher for Independent Iron Works, Inc., before defendant submitted its bid for the wharf shed job. A copy of the written agreement between the parties was attached as an exhibit to plaintiff's Complaint.

At the time of the February hearing neither the written proposals submitted to the defendant by the plaintiff nor the written contract finally entered into between the parties were discussed or specifically by their terms brought to the court's attention by argument or otherwise, and the court drew the inference that the defendant's contract with the Harbor Board covered the entire matter of the compensation, so far as weights were concerned, that plaintiff was entitled to, and the court stated that the contractor should pay the subcontractor for same weights that the Harbor Board had contracted to pay the defendant.

During the later and main hearing of facts in August such revealing evidence was submitted as to present a new and different picture as to the contractural relations between the plaintiff and defendant.

It appears quite certain that in the first negotiations there was an agreement as to a per ton price as to steel, fabrication and erection at $230 per ton; that this was later changed to $200 and $197 per ton for the fabricated steel delivered and $30 per ton for erection, the erection to be done under a separate contract between defendant and a concern associated with plain-

tiff, named Industrial Development Company, which had been created in 1944 for similar erection work by members of the families of the owners of Independent Iron Works, Inc. The defendant expressed willingness in late July or August, 1947 to make separate subcontracts between itself and the parties named at the prices named, "so long as the work did not cost it more than $230 per ton of steel in place".

Contracts between the parties were drawn and redrawn and finally agreed to and executed March 25, 1948, relating back to September 1, 1947, the defendant, under advice of its attorney, requiring the plaintiff to indemnify it by bond in the sum of $50,000 for the faithful performance of erection work by the Industrial Development Company and inure to the benefit of materialmen and labor performed on the job.

From all the legal and relevant evidence, nearly all of which I found to be highly credible, it is impossible for me to arrive at any conclusion with respect to a complete agreement or anything which could be enforced as a valid and subsisting contract covering the entire transaction other than the written agreement between the parties which was finally signed on March 25, 1948, relating back to September 1, 1947. True, from the beginning there was an oral proposal, followed by a written proposal (Exhibit Z–2), as to the prices per ton and the ton prices were agreeable to the defendant who promised a subcontract to the plaintiff in the event defendant obtained the contract with the Harbor Board. Both parties seemed to think that was the essential thing to get settled and neither have ever disputed those ton prices. The difference arises principally as to the number of tons furnished and the manner of computing weights.

The plaintiff's bargainer, W. G. Meagher, testified that he told the defendant's bargainer, George M. Collins, at the beginning that he computed weights in accordance with AISC code and that the defendant in making its bid to the Territory should add about 5% to Harbor Board's estimated weights. Mr. Collins denied all memory of such a conversation and says it did not take place within his hearing. Mr. E. E. Black says he knew nothing of it. Subcontract steel bids submitted by other bidders referred to AISC code as the basis for determining weights and demanded freedom from tax liabilities.

Evidently, too many things not fully discussed were taken for granted upon the supposition that details could be worked out in future negotiations. Mr. Collins says that he did not write acceptance on the printed tender form submitted by plaintiff because it did not specify a time for completion (a thing which could have been written in within a minute or two), but he says Mr. Meagher said he could complete the delivery of steel in six months and the erection in two months. Then there was the matter of when payments should be made for subcontract work and no definite agreement was closed until the written contract became effective. And no offer or proposal as to price was made as to Item 5 of the Harbor Board specifications until it was brought up in later conversations. Neither party was prompt in formulating a definite and full agreement, but both parties went forward with confidence that everything would work out in accordance with their own ideas and desires.

For some months the plaintiff was, apparently in good faith, depending on what earlier conversations between Meagher and Collins meant to Meagher, while the defendant, in good faith, had a very different view as to what was understood and considered by Black and Collins as settled. Mr. Black testified that it was often customary with him to base his bids on telephone proposals and conversations with material suppliers—settling minor details afterwards. Mr. Meagher testified that in his forty years in steel fabrication, running as high as $5,000,000 in a year, he never had and never would submit a bid unless weights and fabrication requirements were to be determined in accordance with rules of the AISC code which was his bible, and that he could not think of binding his firm to accept weight determinations of the ultimate buyer with whom he had no direct relations; that all his pro-

posal forms had the manner of calculating weights printed thereon as a condition of the bid. These are some of the things which convince me that it is impossible to say that an actual contract existed prior to the written document, Exhibit "A", of September 1, 1947, notwithstanding the fact that defendant was dependent solely on plaintiff furnishing the steel, and plaintiff had expended large sums of money in preparation to furnishing it, long before March 25, 1948, when the contract was signed, or even September 1, 1947. Both parties would have been in dire distress had not a final agreement covering all essential particulars been reached by the time the fabricated steel was ready for shipment in May 1947.

I find that oral conversations, offers and concurrences between the parties' agents did not define a contract in many essential and necessary particulars; that in the meantime they were dealing in faith and hopes, and no actual, complete contract came into existence until September 1, 1947, signed March 25, 1948, when and wherein all essential terms were defined.

The contract specifically provides that AISC code shall be used in determining weights for payment, Articles I and XI, by incorporating printed conditions on back of proposal forms submitted by plaintiff to defendant.

1. This being so, the plaintiff's claim for an undisputed quantity of nuts, bolts, rivets, weld metal and paint, 22.748 tons at $200 per ton and 1.102 tons at $197 per ton must be and is allowed in the total sum of $4,756.75.

2. Harbor Board engineers figured the weight of steel in Items 5 and 6 to be 1425.6355 tons, and in Item 17, 23.034 tons, and paid defendant on that basis.

Plaintiff figures these weights on Items 5 and 6 at 1417.68 tons and on Item 17 at 23.7305 tons, and adds 3%, under authority of AISC code for mill over-run and ½ of 1% for paint, making its Items 5 and 6 1467.5415 tons and Item 17, 24.5645 tons.

It will be seen that the Harbor Board computation of weights on Items 5 and 6 exceed by 7.9555 tons the weights figured by plaintiff without adding the over-run and paint weights, and .6965 ton less on Item 17 than plaintiff's weights, without including over-run and paint weight. But, when these latter items of weight are included, the plaintiff's weights on Items 5 and 6 are 41.906 tons in excess of Harbor Board's calculations and on Item 17 1.5305 tons more. These charges are allowed plaintiff in the sum of $8,381.20 on Items 5 and 6 and $148.46 on Item 17, a total on fabricated steel weights of $8,529.66.

It is true that this over-run weight at 3% is somewhat an arbitrary figure. Competent evidence shows that over-run may be as much as 12% or as little as 1% but in steel of the various shapes and patterns used in this fabrication it is concluded that the 3% used for steel and ½ of 1% for paint is reasonable and fair, and plaintiff's witness, W. G. Meagher, testified that he had demonstrated their correctness many times on similar structures and offered to prove their correctness within 1% of the gross. Defendant did not ask him to do so and seemed satisfied, if over-run was to be allowed, to accept these per centum figures without further question as to their accuracy.

3. As to the plaintiff's charge of $744.48 for 3,384 feet at 22¢ per foot for additional welding reinforcements beyond the Harbor Board's specifications, which work was required to be done by the plaintiff in its shops at the order of the Harbor Board's agent, engineer and inspector before the work would be accepted, this claim is allowed against the defendant. The work went into the Job (HC 750) and plaintiff's fabricated work could not have passed inspection at its shops or have been received on the job without it. It was the duty of defendant to pay plaintiff for this required additional work and, if necessary, to enforce repayment to itself from the Territory.

4. As to plaintiff's charge for detail drafting, estimating and making shop-plans in conformity with directions of the Harbor Board's designing and consulting engineer at Oakland who had been given authority and put in charge of this work

by it, which detailed charge amounts in three items to a total of $1,866.03, there is no reasonable question but that the Harbor Board should have approved the payment of these items of expense which it caused to be imposed on plaintiff through its agent and which plaintiff had every right to expect the defendant to recover from the Harbor Board and pay over to it. The defendant endeavored to collect from the Harbor Board, as it did for the next following item, but the Harbor Board refused to pay. The defendant then declined to pay, for the mistake of the Harbor Board's agent proved to be no direct responsibility of defendant. There being no contract between the parties at the time this work was done the plaintiff must suffer the same disadvantages as the defendant in their undefined relations. This claim is disallowed, and perhaps the only recourse of the plaintiff would be to go to the Legislature, as in the next item.

5. As to 160 additional blueprints which the Harbor Board engineers required the plaintiff to make under their interpretation of the Board's contract with the defendant, for which prints the plaintiff charged defendant 50¢ each, or $80, my understanding is that the order for these prints went to the plaintiff direct from Harbor Board engineers before a contract existed between the plaintiff and defendant. The plaintiff was never under an obligation to supply more than three copies of each of its shop-plan prints and should have been paid for the extras demanded from it. Neither was the defendant obligated to furnish an excessive number of shop-work drawings to the Harbor Board. The plaintiff must look to the Territory for its compensation.

In its counterclaims defendant claims $1,310.50 for steel which it purchased to complete the erection of the wharf sheds and claims that certain pieces of steel were short delivered by plaintiff. The shortage was not noticed or claimed until months after the delivery of the steel at Hilo on the pier where the building was to be erected. The steel had been checked at Oakland by Hunt & Company, experts employed by the Harbor Board for that purpose, and was reported by Hunt & Company at the time of loading for transit to be in order and complete. A detailed shipping list (Exhibit "W"), with each bundle, box, set and separate piece, separately described and numbered, was delivered to defendant's agents in its office at Hilo upon arrival of the material there. No attention was paid to this list nor was any check made by defendant's agents in charge of the job. Just who was responsible for the safety of the steel after its delivery was not determined. Other steel construction work was going on in the near vicinity, as shown in testimony and by photographs, and other steel construction materials were passing over the same wharf. When and as shortage of certain pieces was discoverd, defendant proposed to Industrial Development Company's foreman that it would purchase and supply them at the cost of plaintiff. The foreman said he would have to obtain consent of Mr. W. G. Meagher before he could agree and later reported that the plaintiff agreed. This testimony as to consent was not rebutted and I therefore find this countercharge allowed against the plaintiff in the sum of $1,310.50.

Defendant's counterclaim of $447.80 for cutting galbestos material in order to make it fit the steel superstructure is disallowed for the reason that there is no clear evidence that the steel work was not fabricated in accordance with specifications and met all the requirements and approval of the Harbor Board's designing engineer and inspectors before shipment.

Defendant's counterclaim of $7,645.25 for gross income tax is disallowed. This tax is a part of that assessed by the Territory against the contractor (defendant) by reason of payments having been made directly to it on its entire contract. The defendant paid the tax. At no time had the plaintiff ever agreed to pay this portion of the tax. It was a California corporation and procured and fabricated the steel in California, shipping it from that state for delivery in Hawaii as designated by defendant. Its work was then at an end when it delivered the steel according to specifications. A tax office official in charge of gross income tax division tes-

tified that the tax was levied against the defendant, no part of it was or could have been levied against plaintiff under the circumstances.

■ Defendant claims $6,992.21 as a counterclaim for painting and repainting the steel delivered by plaintiff. It is the fact that a substantial number of pieces and fabricated sets of steel were more or less injured by friction scuffing and by being bent in the process of loading, carriage, unloading and sorting, and a number of members had to be reformed by the use of blowtorches, pressure and hammering. This, of course, destroyed the initial coat of paint applied at the "shop" and made cleaning and repainting, at the places where paint was injured by these operations, the obligation of plaintiff. Also, due to hurried shipment, about 100 tons were painted at the shop without proper cleaning at and surrounding welded surfaces, and a relatively small amount of welding was required after delivery on the dock. The Harbor Board's inspector on the job testified that considerable steel showed rust and was not in good condition and he estimated that 30% of the members needed touch-up and repainting at joints before permanent coats were applied. AISC code does not require seller to touch up shop paint upon delivery at job, unless by special agreement. The Harbor Board inspector seems to have looked to the erector, the Industrial Development Company, to do this painting. It in turn called on the plaintiff who authorized it to the extent of about $2,000 and then refused to do more. The defendant found it necessary to hire its own paint contractor to do the work demanded by the inspector, and charged it to the plaintiff. Mr. Meagher stated that shop painting, which he had contracted to do, cost him only $5 per ton of steel or even a less sum than defendant's demand for touch-up painting, which plaintiff was not required to do.

I find that plaintiff should pay for 30% of the cost of painting required by the Hilo inspector and allow this counterclaim in the sum of $2,097.66.

■ Defendant makes a counterclaim for $1,500, the amount of penalty charge the Harbor Board withheld from payments to it for delay in finishing the work within the time limit specified in its contract and extensions granted thereto. This claim is disallowed for the reason that plaintiff delivered the steel at the job prior to June 9, 1948, the time allowed it under its contract (Article 1) with the defendant.

The interest claim of plaintiff will have to be amended to conform to the evidence and the counterclaims allowed herein. It developed in the trial that defendant paid to the plaintiff an additional $9,795.95 on August 18, 1949, some four months after plaintiff's Complaint was filed herein. It is vague as to when the Harbor Board accepted the steel, the delivery of which was completed on the job in June and July, 1948. Its authorized inspector, Hunt & Company, had inspected and accepted it as fulfilling requirements of specifications on the dock at Oakland in April, 1948, Exhibit "N", Final Structural Report. Thereafter it appears to have been inspected and accepted by the Harbor Board, except as to paint only, as it was put into place in the shed construction, after which there was much other work to be done on the building by the defendant. Shortly after the steel arrived at Hilo the Harbor Board paid to defendant $204,784.70 (Exhibit 6) of which sum defendant paid plaintiff $202,721.19, a large part of which was on June 8, 1948 (Exhibit 6).

Then there remains the matter of attorney's fees. The plaintiff offered to put on evidence as to this value at the close of its case in chief, but it seemed to be premature at the time and no evidence in this matter was later received.

It is suggested now that the contract between the parties has been determined and all other claims and counterclaims prayed for have been found and adjudged by the court, that the parties make an effort to amicably settle the questions of interest and attorney fees. Failing in this the court is open for early further trial.